OPINION
This is a timely appeal from the judgment of the Mahoning County Court of Common Pleas entered after a jury found Edward Dubose ("Appellant") guilty of improperly discharging a firearm into an occupied structure and of two counts of felonious assault, each count with its own gun specification. Appellant was sentenced consecutively to four years of incarceration on each count with three additional years due to a firearm specification. Appellant also challenges the trial court's decision to impose consecutive sentences.
This appeal advances nine assignments of error, several of which have been waived because they were not raised in the trial court. Based on the discussion that follows, this Court affirms the judgment entered by the trial court.
Sometime before dawn on March 25, 1999, five or six large caliber bullets were fired into the home that Annette and Samuel Dubose, Jr. shared with their four young children. Appellant's arrest in connection with this incident occurred later that morning. A grand jury subsequently issued a three-count indictment. The indictment charged Appellant with two counts of felonious assault in violation of R.C. §2923.11(A)(2)(B), both with a firearm specification. One count charged that Appellant improperly discharged a firearm at or into an occupied structure in violation of R.C. § 2923.161(A)(C). The third count also included a firearm specification.
At trial, Samuel Dubose, Jr. testified that early on the morning of the shooting, Appellant called and accused him of carrying on an affair with Appellant's girlfriend, Anissa Yancey. (Tr. pp. 65, 107). Appellant and Samuel are cousins. (Tr. pp. 65, 107). Samuel denied the affair. Annette joined in the discussion and tried to convince Appellant that he was mistaken. Appellant was irate and refused to believe them. (Tr. pp. 65, 108, 179). At one point, Appellant threatened Samuel with a confrontation if Samuel did not tell the truth about the affair. (Tr. pp. 76, 109). Both Annette and Samuel perceived the comment as a threat. (Tr. pp. 76, 109).
The discussion continued for some time during a series of telephone calls. One party would disconnect only to be recalled by the other. In his effort to convince Appellant there had been no affair, Samuel contacted Appellant's sister, who lived next door to Samuel, and Appellant's mother, involving them in the ongoing problem. (Tr. pp. 175-179). At approximately 5:00 a.m., Samuel and Annette heard the sound of gunfire coming from just outside their home. (Tr. pp. 67-68, 111). They were forced to the floor to avoid being struck by the bullets that flew over their heads. (Tr. p. 112).
While Annette called the police, Samuel ran upstairs to check on the couple's children. As he did so, Samuel looked through a stairway window which had a view over the front of the house and the street. He saw Appellant leap from the porch, run for his car and drive away. (Tr. pp. 113-114). According to Samuel, Appellant was carrying a gun. Samuel also recognized the blue Cadillac that Appellant used to escape as a vehicle Appellant used in the past. (Tr. p. 115).
Samuel gave this same account both at the preliminary hearing and at trial. On the eve of trial, however, Samuel briefly recanted, telling prosecutors and a defense investigator that he had not seen anyone through the window and that he could not identify Appellant as the man who shot at his house. (Tr. pp. 118-119). At trial, Samuel returned to his original story, testifying that he did see Appellant with the gun in the moments following the incident. Samuel explained that his brief change of story was caused by his fear of what Appellant would do to him if he testified. (Tr. p. 133).
At trial, there was testimony by Annette that after the shooting, the couple received another phone call. Annette answered the phone and recognized Appellant's voice. She stated that Appellant told her he would come into the house and kill them all if she did not send Samuel outside. According to Annette, when she asked about her children, Appellant responded that he would kill the whole family if she failed to send Samuel out. (Tr. p. 84).
Samuel's father, Samuel Sr., lived nearby. When he learned of the shooting, he went to his son's house to assess the damage. He relocated the family to the basement of his home, where he thought they would be safer. Shortly after 6:00 a.m., Samuel Sr. received at least two telephone calls from Appellant. Samuel Sr. has known Appellant all his life and is familiar with the sound of his voice. (Tr. pp. 146-147). Although Samuel Sr. did not recall the precise substance of the conversation, he was certain from the tone of Appellant's voice that Appellant was threatening him.
A retired police officer, Samuel Sr. also had the presence of mind to take contemporaneous notes of the conversation. (Tr. pp. 141-142). In the wake of that conversation, Appellant left no doubt in Samuel Sr.'s mind that Appellant intended to harm he and his family. (Tr. p. 142). After Appellant's second call, Samuel Sr. reported the incident to the police.
Following this testimony, the prosecution introduced telephone records confirming that Samuel Sr. received two telephone calls from the same number at approximately the time he claimed to have received Appellant's threatening calls. (Tr. pp. 163-164).
The jury found Appellant guilty of all three counts in the indictment. On March 27, 2000, the trial court sentenced him to four years of imprisonment on each of the three counts in the indictment to be served consecutively. The court merged the three firearm specifications into one, for which it imposed an additional consecutive term of three years. (Sentencing Tr. pp. 21-23).
On March 28, 2000, Appellant filed a notice of appeal from his conviction and sentence.
In his first assignment of error, Appellant maintains that,
 "DEFENDANT/APPELLANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL AS THE STATE OF OHIO FAILED TO BRING HIS CASE TO TRIAL WITHIN THE TIME REQUIREMENTS AS SET FORTH IN ARTICLE I, SECTION 10 OF THE CONSTITUTION OF OHIO, CODIFIED AT OHIO REVISED CODE SECTION 2945.71."
Appellant argues that his right to a speedy trial was violated because he was not tried within the time provided under R.C. § 2945.71. According to Appellant, in the absence of an explicit waiver, R.C. §2945.71 requires that he receive a trial within 270 days of his arrest. In this case, Appellant maintains that he was arrested on March 25, 1999, and held in custody until trial commenced on March 20, 2000. Since 360 days elapsed between arrest and trial, Appellant argues that his right to a speedy trial was violated and thus his discharge is warranted.
In contrast, Appellee painstakingly accounts for each day of this period, attributing any delays to Appellant to conclude that Appellant was tried within the statutory limits.
The speedy trial act provides that a person charged with a felony must be brought to trial within 270 days of his arrest. Where the defendant is held in custody in lieu of bail on the pending charge, trial must commence within ninety days of arrest. R.C. § 2945.71(E). Nevertheless, like all other rights of a non-jurisdictional nature, rights under the speedy trial act are not self-executing. State v.Trummer (1996), 114 Ohio App.3d 456, 470. While a formal speedy trial demand is not required of a defendant, his release based on a denial of that right will not be granted unless that right was invoked in the first instance in the trial court. State v. Dumas (1990), 68 Ohio App.3d 174,176.
After reviewing the record below, this Court notes that not once during the pendency of Appellant's case did he bring his speedy trial concerns to the attention of the trial court. Since Appellant raises this issue for the first time on appeal, he has unquestionably waived any challenge under the speedy trial act. State v. Baldauf (1990), 67 Ohio App.3d 190,196; see also State v. Frazier (June 14, 2001), Cuyahoga App. No. 2768, unreported; and cases cited therein.
In his second assignment of error, Appellant complains as follows:
 "THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY THAT THE STATE MUST PROVE THE FIREARM SPECIFICATIONS BEYOND A REASONABLE DOUBT."
Here, Appellant contends that the trial court should have instructed the jury that it had to find him guilty of the firearm specification beyond a reasonable doubt. Appellant concedes that he failed to raise this issue in the trial court but nonetheless insists that the trial court's failure to give a reasonable doubt instruction specifically addressing the firearm specification amounts to plain error. Based on the record herein, Appellant's argument must fail.
Criminal Rule 30 governing jury instructions provides that, "a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." See Crim.R. 30(A). Failure to do so will result in a waiver of the issue on appeal.
Nevertheless, as Appellant aptly points out, a reviewing court may consider plain errors or defects that affect substantial rights even where they were not brought to the attention of the trial court. Crim. R. 52(B); State v. Demiduk (June 24, 1998), Columbiana App. No. 96-C0-16 (unreported), citing State v. Walker (1981), 2 Ohio App.3d 483. Plain error is defined as, "obvious error which is prejudicial to an accused, although neither objected to nor affirmatively waived, which, if allowed to stand, would have a substantial adverse impact on the integrity of and public confidence in judicial proceedings." State v. Craft (1977),52 Ohio App.2d 1, 7.
Under R.C. § 2941.145(A), a defendant's sentence can be enhanced by three additional years of actual incarceration in the event the prosecution proves that he, "* * * had a firearm on or about [his] person or under [his] control while committing the offense and displayed the firearm, brandished the firearm, indicated that [he] possessed the firearm, or used it to facilitate the offense." Before the firearm specification can apply, the state must prove it beyond a reasonable doubt. State v. Gaines (1989), 45 Ohio St.3d 65, 68.
Appellant argues that the trial court committed plain error when it failed to explicitly instruct the jury that it needed to find the elements underpinning the firearm specification beyond a reasonable doubt. Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, 97. There is no miscarriage of justice here.
In determining whether plain error occurred, the reviewing court looks to whether the jury would have convicted absent the objectionable evidence. State v. Slagle (1992), 65 Ohio St.3d 597, 605. Jury instructions, "must be viewed in the context of the overall charge rather than in isolation." State v. Lewis (1993), 67 Ohio St.3d 200, 203.
The record in the instant case reflects that the jury received general instruction regarding the presumption of innocence as follows:
"The defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense charged in the indictment." (Tr. p. 250).
The trial court went on to describe the reasonable doubt standard. Then after instructing the jury on each of the elements of the crimes charged, the trial court instructed as follows with respect to the firearm specification:
"If your verdict is guilty to any count charged in the indictment, you will then separately decide whether the defendant had a firearm on or about his person or under his control while committing the offenses charged in the indictment." (Tr. p. 259).
After defining "firearm" and "deadly weapon", the trial court reiterated that the state had to prove the essential elements of the offenses charged beyond a reasonable doubt. (Tr. p. 260). These instructions, viewed in their entirety, sufficiently apprise the jury of their obligation to find the firearm specification beyond a reasonable doubt.
A similar conclusion was reached in State v. Blankenship (1995),102 Ohio App.3d 534. In Blankenship, the defendant argued that the trial court committed plain error when it failed to sua sponte instruct the jury separately that it must find the element of the firearm specification beyond a reasonable doubt. Id. at 546. After examining the instructions overall, the reviewing court concluded that there was no reasonable possibility that the failure to so instruct the jury regarding the specification affected the outcome of the verdict. In particular, the court noted that since the jury convicted the defendant on the count alleging possession of a firearm while under a disability, it had obviously found all the elements of the firearm specification beyond a reasonable doubt. Id. See accord State v. Small (Nov. 2, 1995), Cuyahoga App. No. 68167, unreported.
The reasoning employed in Blankenship applies to the instant case as well. The jury convicted Appellant on two counts of felonious assault and one count of discharging a firearm into an occupied dwelling. Accordingly, in convicting Appellant of discharging a firearm, the jury obviously found the attendant firearm specification beyond a reasonable doubt. Since the trial court merged the three specifications into one, any alleged error, should it exist, was harmless as a matter of law. Therefore, this assignment of error is overruled.
In his third assignment of error, Appellant maintains that,
 "THE TRIAL COURT ERRED IN PERMITTING THE STATE'S WITNESSES TO TESTIFY ON DIRECT EXAMINATION TO PRIOR BAD ACTS OF DEFENDANT/APPELLANT AS WELL AS THE GENERAL BAD CHARACTER OF DEFENDANT/APPELLANT."
Appellant argues that the trial court erred by allowing the introduction of evidence prohibited under Evid.R. 404(a), which bars the use of character evidence to show the accused's propensity to commit the crime charged.
The evidence at issue here was properly admitted, however, under Evid.R. 404(b). The trial court's rulings with respect to the admission or exclusion of evidence are typically discretionary. This Court will not disturb such rulings absent a showing that the trial court abused its discretion, thereby causing material prejudice to the defendant. Statev. Martin (1985), 19 Ohio St.3d 122, 129.
Evid.R. 404(B) states that evidence of other crimes or bad acts is not admissible to prove the evil nature of a person in order to show that he acted in conformity with that evil nature. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident. This evidentiary notion is parallel to R.C. § 2945.59, which provides:
 "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."
Although not specified in the statute, identity has been held to be within the concept of "scheme, plan, or system". State v. Curry (1975),43 Ohio St.2d 66, 73; and Evid.R. 404(B) (Staff Note).
Both the rule and the statute speak to acts which may or may not be similar to the crime at issue. If the other act does in fact "tend to show" any of those enumerated items, then evidence of the other act may be admissible, barring concerns addressing probity and prejudice under Evid.R. 403. State v. Broom (1988), 40 Ohio St.3d 277, 282, citing Statev. Flonnory (1972), 31 Ohio St.2d 124, 126.
The prosecution introduced the disputed evidence through Samuel Jr.'s testimony. Samuel testified that on the evening before the shooting, Appellant beat up his girlfriend, Anissa Yancey. Samuel also testified that Appellant had threatened him that night and that he was afraid of Appellant. Though patently damaging to Appellant, this evidence does not violate Evid.R. 404(a). Evidence that Appellant had threatened Samuel and Annette on the night of the incident and beat up his girlfriend after she told him about her supposed affair with Samuel is relevant to show identity under Evid.R. 404(b). Identity was a disputed issue in this case. During closing argument Appellant proposed that someone else committed the shooting. The testimony is also relevant to show why Samuel may have been afraid of Appellant and why Samuel could have briefly recanted his identification of Appellant as the shooter. Consequently, this assignment of error is overruled.
In his fourth assignment of error, Appellant contends that,
 "THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES UPON DEFENDANT/APPELLANT."
Appellant next complains that the trial court had no authority to impose consecutive sentences in this matter. A jury convicted Appellant of felonious assault against both Samuel and Annette Dubose, as well as the distinct offense of improper discharge of a firearm into the couple's home. Appellant claims that these offenses were allied, of similar import, and committed as part of the same transaction and animus. Accordingly, Appellant argues that the trial court should have merged these convictions and sentenced him concurrently. Appellant does not challenge the three-year consecutive term imposed for the merged firearm specifications. Review of the record in this case in light of the relevant authority forces us to conclude that Appellant is mistaken.
R.C. § 2953.08(G) provides that an appellate court entertaining an appeal of a felony sentence may modify or vacate a sentence and remand the matter to the trial court for resentencing if the court clearly and convincingly finds, "(a) [t]hat the record does not support the sentence; [or] * * * (d) [t]hat the sentence is otherwise contrary to law." Therefore, this Court must examine Appellant's sentence with an eye toward whether the record supports the sentence or whether it is otherwise contrary to law. State v. Roth (May 14, 1999), Belmont App. No. 97-BA-58, unreported; R.C. § 2953.08(G)(1)(a), (b).
R.C. § 2941.25, which addresses the merging of offenses and allows for multiple convictions under limited circumstances, states as follows:
"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all offenses, and the defendant may be convicted of all of them."
In enacting R.C. § 2941.25, the legislature intended to permit a defendant to be punished for multiple offenses of dissimilar import under certain circumstances. State v. Blankenship (1988), 38 Ohio St.3d 116,117. In the event a defendant's actions, "can be construed to constitute two or more allied offenses of similar import," the defendant may be convicted (i.e., found guilty and punished) of only one. R.C. §2941.25(A). But if a defendant commits offenses of similar import separately or with a separate animus, he may be punished for both pursuant to R.C. § 2941.25(B). State v. Rance (1999), 85 Ohio St.3d 632,636; citing State v. Jones (1997), 78 Ohio St.3d 12, 13-14.
The evidence adduced at trial indicates that early on the morning of March 25, 1999, Appellant fired several bullets from a large caliber firearm into the Duboses' home after making telephone calls during which he threatened to "get" them and their children. The evidence further showed that Appellant did so knowing that the Duboses' and their children were inside the dwelling.
While Appellant committed his crime as part of a single course of misconduct, the felonious assault convictions in this case plainly involved two distinct victims. Where a defendant commits the same offense against different victims during the same course of conduct, a separate animus exists for each offense. State v. Gregory (1993),90 Ohio App.3d 124, 129. See accord, State v. Bonhomme (April 6, 1992), Clermont App. No. CA91-08-058, unreported (consecutive sentences for felonious assault were appropriate where evidence showed that defendant shot at a motor vehicle while aware that it had two occupants); and Statev. Lee (September 3, 1998), Franklin App. No. 97APA12-1629, unreported (three consecutive terms for felonious assault were appropriate where defendant fired into a bedroom knowing that there were three people inside).
In imposing consecutive sentences where multiple victims are involved, the key is the number of victims and whether the defendant could reasonably have been aware that they were there. In this case, there is no question that Appellant knew that the Duboses were in the house when he shot into it. He had been on the phone with them most of the night. After the shooting, Appellant called the house again, reiterating his threats. Under the circumstances, the trial court did not err when it imposed separate convictions for the two felonious assault convictions.
The decision to impose a separate conviction and sentence for the offense of discharging a firearm into the house was also proper. Determining whether two offenses are allied requires a comparison of the elements of the offenses. Two offenses will be treated as allied where their elements correspond to such a degree that the commission of one crime necessarily results in the commission of the other. Blankenship,supra at 117. Nevertheless, the Ohio Supreme Court has held that under a R.C. § 2941.25(A) analysis the statutorily defined elements of offenses that are claimed to be of similar import are compared in the abstract (overruling Newark v. Vazirani (1990), 48 Ohio St.3d 81).
Accordingly, this Court must evaluate, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes of felonious assault and improper discharge of a firearm into an occupied structure, "correspond to such a degree that the commission of one crime will result in the commission of the other." Rance, supra, citing Statev. Jones, 78 Ohio St.3d at 14. If so, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. Id.
One commits the offense of felonious assault by knowingly causing or attempting to cause physical harm to another through the use of a deadly weapon. R.C. § 2903.11(A)(2). On the other hand, R.C. §2923.161(A), prohibits an individual from knowingly discharging a firearm at or into an "occupied structure" which is the place of habitation for another person. An occupied structure is any house which, at the time of the offense is, "* * * occupied as the permanent or temporary habitation of any person, whether or not any person is actually present." R.C. § 2909.01(C).
A comparison of the two offenses suggests that while one who knowingly discharges a firearm at a house might also commit the offense of felonious assault, that will only be the case if someone is at home when the discharge occurs. Accordingly, one may commit the offense of wrongful discharge of a firearm into an occupied structure without attempting to cause harm to another. State v. Mallet (Aug. 17, 2000), Cuyahoga App. No. 76608, unreported. Conversely, one may commit the offense of felonious assault, which involves the more general use of a deadly weapon, without the wrongful discharge of a firearm. Therefore, it was proper to convict Appellant separately for the firearm discharge offense.
The imposition of consecutive sentences for multiple convictions is controlled by R.C. § 2929.14(E)(4). Under this provision, the trial court may impose consecutive sentences under the following circumstances:
"* * * if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 "(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
At Appellant's sentencing hearing the trial court essentially found that consecutive sentences were warranted in light of the seriousness of the offenses and Appellant's significant criminal history. Specifically, the trial court noted that,
"I have evaluated the potential of recidivism here, and it would appear very, very significant in view of the defendant's prior record and in view of the fact that this incident has involved not only the fact that it is somewhat domestic in nature, but in view of the fact that the defendant, in fact, used a firearm. Not just a small firearm.
"I think that we all recall in looking at the house, the damage that was done to the house, in particular some of the iron that was hit by the slugs that were involved in this thing, had those hit a child that was in that house or had they hit a person that was in that house, then we would be here under a lot different circumstances." (Sentencing Hearing, Tr. pp. 20-21).
In this colloquy, it is apparent that the trial court found both the requisite high likelihood of Appellant committing future crime and pursuant to R.C. § 2929.14(E)(4)(b) that the crime was of such a serious nature that one term would not sufficiently reflect the seriousness of the crime. Thus, the reasoning of the court, while not explicitly stated, can definitely be seen on the record. Because this reasoning is reflected in the record, the dissent's reliance on State v.Boland, 7th Dist. No. 00-CA-129, 2002-Ohio-1163, is misplaced.
Given the above findings, the imposition of consecutive terms in this case was justified and Appellant's fourth assignment of error is overruled.
Appellant's fifth assignment of error states,
 "THE TRIAL COURT ERRED IN ALLOWING THE STATE'S WITNESSES TO TESTIFY ABOUT STATEMENTS ALLEGEDLY MADE BY DEFENDANT/APPELLANT REGARDING HIS OFFER TO MAKE RESTITUTION."
According to Appellant, the trial court erred when it permitted the introduction of testimony that Appellant had offered one of the victims $400.00 ostensibly as restitution for the damage caused by the shooting. Appellant argues that this testimony should not have been admitted for two reasons. First, under Evid.R. 408, as an offer of settlement, it was inadmissible. Second, because the prosecution failed to disclose this testimony in accordance with its discovery obligations, it should have been barred under Crim.R. 16(B)(1)(F).
Contrary to Appellant's claims, the testimony to which he objects was properly admitted. As noted previously, the trial court's rulings with respect to the admission or exclusion of evidence are typically discretionary. This Court is reluctant to interfere with a court's determination concerning the admissibility of evidence unless the court has clearly abused its discretion and the party challenging its admission has been materially prejudiced by it. State v. Maurer (1984),15 Ohio St.3d 239, 265.
The evidence at issue here was elicited through the testimony of Annette Dubose. Specifically, Annette testified that, "* * * [Appellant] said that he was upset that I came down and lied on him about the phone harassment and that he was willing to make the restitution for the damage he caused to the house." (Tr. p. 71). According to Appellant, Evid.R. 408 prohibits the introduction of evidence related to settlement negotiations. Entitled Compromise or Offers to Compromise, Evid.R. 408 limits the introduction of evidence pertaining to settlement negotiations as follows:
 "Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."
This rule recognizes that settlement evidence can mislead jurors, motivating them to infer, perhaps erroneously, that the offering party in fact owed the amount offered. Cannell v. Rhodes (1986), 31 Ohio App.3d 183,186.
The parties dispute whether Rule 408's prohibitions apply to criminal cases. Whether or not this is true, Rule 408 plainly provides that statements offered to demonstrate, "an effort to obstruct a criminal investigation or prosecution," are not barred. The record reflects that Appellant offered Annette money to encourage her to drop her complaint or withhold her testimony against him at trial. Such conduct amounts to an obstruction of justice and is exempted by Rule. Accordingly, the trial court did not err when it admitted this evidence.
Appellant also complains that the prosecution blind-sided him with Annette's testimony about his offers of restitution, thereby violating its discovery obligations under Crim.R. 16(B)(1)(F). Discovery in criminal cases is governed by Crim.R. 16. Section (B)(1)(f) is captioned, "[d]isclosure of evidence favorable to the defendant," and is directed at the prosecutor's obligation to inform the defense of any evidence potentially favorable to the defense and material either to guilt or punishment. See Brady v. Maryland (1963), 373 U.S. 83.
The record indicates that the prosecution's failure to provide written advance notice of Appellant's statements to Annette was not willful. (Tr. p. 102). There is nothing in the record to suggest that Appellant's access to this witness prior to trial was impeded. Further, if Appellant had been truly concerned about the substance of Annette's testimony, he could have requested a continuance to fully investigate and prepare. Accordingly, Appellant's fifth assignment of error should be overruled.
In his sixth and seventh assignments of error Appellant maintains the following:
 "THE TRIAL COURT ERRED IN PERMITTING THE VICTIMS' IMPACT EVIDENCE TO BE INTRODUCED AND COMMENTED UPON BY THE PROSECUTOR.
 "DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."
In these assignments of error, Appellant complains about the prosecution's introduction of and argument surrounding allegedly improper victim impact evidence. Since they overlap, these assignments of error will be addressed together. Neither merits the relief that Appellant seeks.
Generally, the conduct of a prosecuting attorney during trial will not warrant reversal unless it substantially deprives the defendant of a fair trial. State v. Lott (1990), 51 Ohio St.3d 160, 165. Once again, because Appellant failed to object in the trial court to the comments he now claims were inappropriate, he has waived all but plain error in this regard. As noted previously in this Opinion, plain error does not occur unless the record demonstrates that, but for the error, the outcome of the trial would have been different. State v. Jordan (Dec. 3, 2001), Scioto App. No. 00CA2748, unreported; citing, State v. Underwood (1983),3 Ohio St.3d 12.
The prosecution is entitled to a certain degree of latitude during closing arguments. State v. Treesh (2001), 90 Ohio St.3d 460, 466. Appellant complains that the prosecution improperly commented on inadmissible victim impact evidence during its summation. The testimony that Appellant maintains amounted to improper victim impact evidence was elicited by the prosecutor through the testimony of Annette as follows:
"Q. All right. Right after the gunshots you called 911?
"A. Right.
"Q. How did you feel when you realized what was happening?
"A. Upset. Mad. Angry.
"Q. Were you scared?
"A. Very scared." (Tr. pp. 66-67).
The prosecutor subsequently drew the following from Samuel:
 "Q. Mr. Dubose, I want you to tell the ladies and gentlemen of the jury how you felt that night when you realized your house was being shot at by your first cousin?
 "A. I was scared. He put me in a predicament I couldn't do nothing. First time in my life I called the police. Any other way, I would have handled it my way. First cousin, I didn't know what to do. I was scared. I have a wife, kids. She never been around anything like this before.
"Q. Slow down. Did you think you were going to die?
 "A. Yes, I thought I was going to die. Listen, after he shot my house up four to five minutes * * * I would have been dead. You ask his sister or my mama. You can ask them. All they will tell you is I would have been a dead man * * *". (Tr. pp. 115-116).
As noted above, trial counsel did not object to this testimony.
The trial court may not admit testimony wherein the victim or the victim's family offers an opinion or recommendation with respect to the appropriate sentence. Nevertheless, victims are entitled to testify about the circumstances surrounding the offense and its impact on his or her family. State v. Treesh (2001), 90 Ohio St.3d 460, 487; citing State v.Goodwin (1999), 84 Ohio St.3d 331, 343; and State v. Fautenberry
(1995), 72 Ohio St.3d 435, 438-439. Such evidence may be offered through a statement prepared by the victim of a violent felony crime wherein he identifies any physical injury suffered as a result of the offense. The statement may also detail the seriousness and permanence of the injury, and discuss any change in his personal welfare or familial relationships as a result of the offense. Victim impact evidence may also include any psychological damage suffered by the victim or the victim's family as a result of the offense. See R.C. § 2947.051(B).
The testimony of which Appellant complains largely amounts to isolated remarks by the victims included in testimony about other matters. These remarks concern suffering related to the offense and do not appear to fit the statutory conception of victim-impact testimony. State v. Sova (April 9, 1998), Cuyahoga App. Nos. 71923, 71924, unreported. In Sova, for example, the court held that testimony from the victim during the trial phase that he had developed chronic difficulty falling asleep as a result of the robbery was not victim-impact evidence. Id. at 4.
Moreover, even if this Court were to characterize Annette and Samuel's testimony as victim-impact evidence, its introduction at the trial phase does not necessarily constitute reversible error. A defendant claiming such error must also show that the trier of fact was "influenced by or considered" the victim-impact evidence. State v. Fautenberry, supra at 439.
The evidence in the record does not show a reasonable probability that the outcome of Appellant's trial would have been different had Samuel and Annette refrained from talking about the fear they experienced as Appellant fired a gun into their home after threatening to kill them and their children. It seems more likely that, in reaching its verdict, the jury was persuaded by Samuel's eyewitness identification of Appellant as the armed man he saw running from his front porch immediately after the shooting or the entirely plausible testimony of Annette, Samuel, and Samuel Sr. where they identify Appellant as the man on the telephone threatening to "see," "get," and "kill" them. (Tr. pp. 69, 145, 153).
Appellant further argues that remarks made by the prosecutor during closing argument about the terror the family suffered as a result of Appellant's menacing behavior amounted to prosecutorial misconduct. The test for prosecutorial misconduct in closing argument is whether the remarks made were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Mundy (1994),99 Ohio App.3d 275, 300; citing, State v. Smith (1984), 14 Ohio St.3d 13. Since the evidence itself was admissible, argument directed at that evidence is also proper.
Appellant also maintains that the prosecutor's comments during summation, drawing attention to Appellant's failure to produce witnesses, improperly shifted the burden of proof. Appellant directs this Court to the following:
 "Since I mentioned common sense, let's talk about what makes sense. You heard the names during the trial, the Franklins. You heard Ben Phillips. Who are these phantom people? Did you see any of them on the stand to testify?" (Tr. p. 246).
A prosecutor may jeopardize the integrity of a trial by commenting on a criminal defendant's decision not to testify. State v. Thompson (1987),33 Ohio St.3d 1, 4; citing Griffin v. California (1965), 380 U.S. 609. The above referenced comments, however, did not shift the burden of proof to the defense, nor do they necessarily constitute a penalty on the defendant's exercise of his Fifth Amendment right to remain silent. The prosecution may comment upon the defendant's failure to prove his own affirmative claims without shifting the burden of proof. See, State v.Collins (2000), 89 Ohio St.3d 524, 527; citing, State v. D'Ambrosio
(1993), 67 Ohio St.3d 185, 193; and State v. Petro (1948),148 Ohio St. 473, 498.
Given that the evidence in the record does not show a reasonable probability that the outcome of Appellant's trial would have been different absent the alleged error, this Court overrules Appellant's sixth and seventh assignments of error.In his eighth assignment of error, Appellant contends that,
 "THE TRIAL COURT ERRED IN ALLOWING THE NOTES OF SAMUEL LEE DUBOSE TO BE RECEIVED AS EXHIBITS."
Appellant argues that the trial court erroneously permitted the prosecution to introduce handwritten notes taken by Samuel Sr. memorializing two telephone conversations he had with Appellant on the morning of the shooting. Appellant maintains that the notes were hearsay and inadmissible under the "past recollection recorded" exception to the hearsay rule set forth under Evid.R. 803(5).
After reviewing the record in this case, we are forced to conclude that Samuel Sr.'s notes of his conversations with Appellant were not properly admitted. Given the circumstances of this case, however, the error was harmless.
Appellant challenges the admissibility of two pages of handwritten notes taken by Samuel Sr. during telephone conversations he had with Appellant on the morning of the incident. These notes record the general nature of the conversations and generally corroborate his recollection that Appellant's tone was threatening. At trial, Samuel Sr. testified that the notes had been taken contemporaneously with the conversations and he identified the handwriting on the notes as his own. (Tr. pp. 141, 147).
When the prosecution asked Samuel Sr. to provide his account of the incident, he mentioned that he had taken the notes and that since the incident had occurred nearly a year ago, reviewing the notes would help him to refresh his memory of what transpired. Specifically, he indicated that he, "would have to rely on them to be precise." (Tr. p. 141). Samuel Sr. then reviewed the notes, returned them to the prosecutor and testified generally about what Appellant said to him during that conversation. The same process occurred with respect to the second telephone conversation. Given this scenario, the notes should not have been offered under the "past recollection recorded" exception to the hearsay rule in accordance with Evid.R. 803(5). Evid.R. 803(5) is an exception to the evidentiary rule barring hearsay and provides as follows:
"A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party."
The record indicates that once Samuel Sr. reviewed his notes, his memory was refreshed and he was able to testify concerning the substance of his conversations with Appellant. While a witness may use any document to refresh his memory under Evid.R. 612, doing so does not automatically render that item and its contents admissible under Evid.R. 803(5). Statev. Ballew (1996), 76 Ohio St.3d 244, 254; citing, 1 Giannelli Snyder, Evidence (1996) 477-478, 574-575.
Therefore, while it was perfectly acceptable for Samuel Sr. to use his notes to refresh his memory concerning what Appellant said during their telephone conversations on the day of the incident, admitting those notes into evidence was not proper. Dayton v. Combs (1993), 94 Ohio App.3d 291,298. The error here, however, was harmless.
We review the trial court's conclusions with respect to the admission of evidence for an abuse of discretion, as noted earlier herein. Statev. Sage (1987), 31 Ohio St.3d 173. This Court has been loathe to reverse matters based on evidentiary errors dealing with the admission or exclusion of evidence unless the defendant's substantial rights are affected. See, State v. Cechura (May 8, 2001), Columbiana App. No. 99 CO 74, unreported, at p. 8. Consequently, violation of an evidentiary rule is harmless as a matter of law if the defendant's guilt is proven by other evidence. State v. Keenan (1998), 81 Ohio St.3d 133, 142.
Even without Samuel Sr.'s notes or his damaging account of the events he experienced that night, evidence of guilt is present and sustains Appellant's convictions. The prosecution presented telephone records corroborating Samuel Sr.'s claim that he received two telephone calls from the same cell phone at precisely the times he said they were received. (Tr. pp. 162-163). The witnesses in this case agreed that Appellant was the individual on the telephone who threatened to "get" them prior to the shooting.
Even Appellant's sister, who was at some point during the evening prevailed upon to help mediate the dispute, largely confirmed the prosecution's theory with respect to the events that led to the shooting. She testified that Appellant had accused Samuel of carrying on an affair with Appellant's girlfriend. (Tr. pp. 175-178).
More importantly, Samuel testified that he saw Appellant run from the scene only moments after the shooting. According to Samuel, Appellant was armed with a handgun and left the scene in a Cadillac that he recognized as belonging to Appellant's girlfriend. (Tr. pp. 113-115). Further, Appellant sealed his own fate by contacting Annette and offering to pay for some of the property damage that he admitted he caused. (Tr. p. 87).
Where guilt is proven by evidence apart from that which is deemed objectionable, the error is necessarily harmless. State v. Rogan (1994),94 Ohio App.3d 140; see also, Neder v. United States (1999), 527 U.S. 1
(noting that most errors, even those of constitutional dimension are subject to harmless error analysis). Clearly, that is the case in this instance and this assignment of error is overruled.
In his ninth and final assignment of error, Appellant argues that,
 "DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL DUE TO THE CUMULATIVE EFFECT OF THE NINE ASSIGNMENTS OF ERROR AS SET FORTH HEREIN."
In his final assignment of error, Appellant contends that the errors argued above cumulatively operated to deny him a fair trial. Cumulative error may warrant a reversal where the existence of multiple errors, which may not each individually require reversal, in concert, violate a defendant's right to a fair trial. State v. Madrigal (2000),87 Ohio St.3d 378, 397; citing State v. DeMarco (1987), 31 Ohio St.3d 191.
There is no cumulative error in this case. To begin with, much of the error that Appellant claims occurred was waived. Any error with respect to the admission of Samuel Sr.'s notes detailing his conversations with Appellant on the night of the shooting was harmless. Given the substantial, even overwhelming, evidence of guilt, this assignment of error is overruled.
As we must overrule all of Appellant's assignments of error, this Court hereby affirms his conviction and sentence.
Donofrio, J., concurs.
DeGenaro, J., concurs in part and dissents in part; see concurring in part and dissenting in part opinion.